Robert CRABTREE, individually and Robert Crabtree, d/b/a Estree Company, Plaintiffs,

v.

TRISTAR AUTOMOTIVE GROUP, INC., Arthur K. Watson, Jr., Charles H. Wilk and Stuart H. Watson, Defendants.

TRISTAR AUTOMOTIVE GROUP, INC., Arthur K. Watson, Jr. and Stuart H. Watson, Counterclaim Plaintiffs,

v.

Robert E. CRABTREE, individually and Robert E. Crabtree d/b/a Estree Company, Margaret J. Lyster, Constance A. Markey, Joseph C. Crabtree and William J. Fox, as trustee of the Joseph C. Crabtree Trust, the Michael R. Crabtree Trust and the Robert E. Crabtree, Jr. Trust, Counterclaim Defendants.

No. 90 Civ. 8222 (GLG).

United States District Court, S.D. New York.

Oct. 30, 1991.

156

Kalnick, Jackson, Klee & Green, P.C. (Stuart A. Jackson, of counsel), New York City, for plaintiffs.

Cravath, Swaine & Moore (John E. Beerbower, of counsel), New York City, for defendants.

## OPINION

GOETTEL, District Judge.

In 1989, the defendants in this case purchased a network of automobile dealerships from the plaintiffs. The transaction did not go smoothly and the resulting disputes have been presented to this court for resolution. The complaint tells the story of a trusting seller who, after yielding possession of his business to the buyer, was asked to pay over a large sum of money in

addition. The counterclaims mirror the complaint's assertions of fraud and breach of contract, claiming that the buyer was duped into purchasing a business whose value was grossly overrepresented. The true story is yet untold. For now, this court's task is to deal with the preliminary matters that arise as this tale unfolds.

## BACKGROUND

TriStar Automotive Group, Inc. ["TriStar"] was organized in 1989 by the three individual defendants, Arthur K. Watson, Jr., Charles H. Wilk and Stuart H. Watson, to purchase the assets of Crabtree Automotive, Inc. ["Crabtree Automotive"], a holding company with ten wholly owned subsidiaries operating a variety of automobile dealerships. Negotiations with plaintiff Robert Crabtree ["Crabtree"], the principal shareholder of Crabtree Automotive,[1] and the sole proprietor of plaintiff Estree Company,[2] began in May 1989 and were concluded with the execution of a Stock Purchase Agreement on June 19, 1989 which effected the sale of the capital stock of Crabtree Automotive to TriStar for an amount equal to the net worth of Crabtree Automotive as of May 31, 1989 plus $1,000,000. This agreement provided that the initial purchase price would be adjusted up or down to reflect the net worth of Crabtree Automotive as determined by a certified "Closing Date Balance Sheet" to be prepared as of August 31, 1989 in accordance with the instructions set forth in the Stock Purchase Agreement.[3]

Although the closing had not yet taken place, TriStar took over the management of the Crabtree Automotive assets on August 15, 1989 pursuant to the Management Agreement. According to plaintiffs, TriStar immediately embarked upon a course of conduct intended to prevent the preparation of an accurate Closing Date Balance Sheet so that the defendants could justify their refusal to pay the plaintiffs the sums of money to which they were entitled. Plaintiffs allege that as part of this scheme TriStar fired all of the personnel familiar with the bookkeeping and financial practices, installed a new computer system which destroyed the bookkeeping systems and records for the business, and systematically removed all of the business records to a new location, confusing them to such an extent that the financial status of the purchased entities could not be determined.

The transaction closed on September 8, 1989. At that time, TriStar paid the plaintiffs roughly $4.5 million;[4] approximately $1.5 million was placed in escrow on the contingency that offsets, as provided for in the Related Agreements, would be necessary. The Stock Purchase Agreement required TriStar to hire Kera, Weiner & Co. ["Kera Weiner"], a certified public accounting firm, to prepare a combined and consolidated balance sheet which reflected the value of Crabtree Automotive as of the closing date so that any necessary adjustments to the original purchase price could be calculated. Roughly eight months after the closing, Kera Weiner wrote to TriStar and Robert Crabtree, informing them that because of difficulties encountered in locating records and supporting documentation and concerns about the completeness of available records, the accounting firm believed that it could not express an opinion

---

1. Crabtree only held part of the stock of Crabtree Automotive. The balance of the stock was held by or in trust for members of Crabtree's family. The sale of Crabtree Automotive to TriStar was negotiated and effected by Crabtree acting for and on behalf of the other shareholders.

2. For convenience, at times, the plaintiffs will be referred to as "Crabtree."

3. Other agreements were executed in connection with this transaction, including a real estate purchase agreement and a consulting and noncompete agreement which provided that in ex-change for an agreement not to operate competing automobile dealerships and to provide expert consulting advice, Robert and Joseph Crabtree would be paid $1,000,000 plus consulting fees. These agreements along with the Stock Purchase Agreement will, on occasion, be referred to as the "Related Agreements."

4. This payment was for the assets of Crabtree Automotive which had a net value of $3.885 million. Other payments, totalling $1.2 million, were made to purchase common stock from two minor shareholders and to satisfy the terms of the Consulting & Non–Competition Agreement.

on the Closing Date Balance Sheet based on acceptable accounting procedures. TriStar then arranged for another accounting firm, O'Connor & Drew, P.C. ["O'Connor & Drew"] to prepare the balance sheet. Based on both adjustments resulting from the balance sheet prepared by O'Connor & Drew and offsets to which TriStar asserted it was entitled under the terms of the Related Agreements, TriStar claimed that the sellers of Crabtree Automotive owed to it over $9 million, exclusive of interest.

In December 1989, plaintiffs filed this action in state court which was removed to this court immediately thereafter. In their answer, certain defendants asserted counterclaims against Crabtree and others. The complaint alleges that defendants violated the Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. § 1961 et seq. Pendent state claims of fraudulent inducement, negligent inducement, breach of contract, breach of fiduciary duty, and conversion are appended. Plaintiffs also seek to foreclose on a note and second mortgage executed in favor of the plaintiffs by TriStar.

Presented now for the court's consideration are the defendant's motion to compel arbitration and stay the proceedings and a motion to dismiss.

## MOTION TO COMPEL ARBITRATION

The Stock Purchase Agreement required TriStar to "cause" Kera Weiner to prepare the Closing Date Balance Sheet within 90 days after the closing date. After delivery of this document to the parties, the agreement gave the plaintiffs or TriStar the right within 30 days to dispute any item contained therein. The Agreement further provides that if the parties could not resolve the dispute within 15 days,

such dispute shall be resolved by a 'Big Eight' accounting firm selected by Kera Weiner (the accounting firm so selected shall hereinafter be referred to as the 'Independent Accounting Firm'); the determination of the Independent Accounting Firm shall be made as promptly as practical and shall be final and binding on the Purchaser and the Sellers.

Stock Purchase Agreement, Section 2.4(a).[5] This arbitration clause states that failure to dispute any item contained on the balance sheet renders the sheet final.

It is undisputed that Kera Weiner never delivered a Closing Date Balance Sheet to the parties. As a result, TriStar retained the services of another accounting firm, O'Connor & Drew. In November 1990, this firm made available to both parties a preliminary worksheet in which the stockholders' equity in Crabtree Automotive was determined to be in excess of negative $4 million as of the closing date. On February 14, 1991, a revised schedule containing the final Closing Date Balance Sheet was sent to the plaintiffs' attorney. This balance sheet reflected a negative stockholders' equity approaching $5 million. According to defendants, the result, after incorporating offsets due to them as provided for in the Related Agreements, was a closing date balance sheet adjustment in favor of TriStar in the amount of $9.2 million.

TriStar made several demands of Crabtree that the matter of the Closing Date Balance Sheet be submitted to arbitration and now moves to compel arbitration. TriStar contends that Crabtree is either bound by the Closing Date Balance Sheet adjustment by his failure to object or is compelled by the terms of the Stock Purchase Agreement to submit to arbitration.[6]

 The federal courts have a broad mandate to enforce arbitration agreements.

---

5. We recognize that due to consolidations within the accounting industry, the Big Eight is now the Big Six. The parties agree that this change in circumstances does not pose an obstacle should arbitration be necessary.

6. Defendants contend that no objection was ever made to the closing date balance sheet as constructed by O'Connor & Drew and their counterclaims accordingly include a claim for

judgment on the adjustment based on Crabtree's failure to object. Crabtree, in his counterclaim answer, denied the allegation that he had failed to object to the proposed Closing Date Balance Sheet. As TriStar is still seeking to enforce the arbitration clause despite its position that the adjustment figure is final, this factual dispute is somewhat irrelevant.

*See, e.g., Moses H. Cone Memorial Hosp. v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *Rush v. Oppenheimer & Co., Inc.*, 779 F.2d 885, 887 (2d Cir.1985). Indeed, if the court is satisfied that there is no dispute concerning the making of the agreement or the failure to comply with it, it should direct the parties to proceed to arbitration in accordance with the terms of the agreement. 9 U.S.C. § 4 (1988). In light of the federal policy favoring arbitration as an alternative dispute resolution process, *see Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 480–81, 109 S.Ct. 1917, 1919–20, 104 L.Ed.2d 526 (1989), any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941–42; *David L. Threlkeld & Co., Inc. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 248 (2d Cir.), *cert. dismissed,* —— U.S. ——, 112 S.Ct. 17, 115 L.Ed.2d 1094 (1991). Arbitration clauses are therefore construed as broadly as possible. *S.A. Mineracao Da Trinidade–Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 194 (2d Cir.1984).

To give fruition to these policies and statutory mandates, a court asked to stay proceedings pending compulsory arbitration under the Federal Arbitration Act must undertake a four-step analysis:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

*Genesco, Inc. v. T. Kakiuchi & Co. Ltd.*, 815 F.2d 840, 844 (2d Cir.1987); *see McDonnell Douglas Finance v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir.1988).

Crabtree does not deny the existence of the arbitration provision in the Stock Purchase Agreement but does deny its applicability to the dispute at hand. Specifically, Crabtree suggests that this arbitration provision is a "narrow" clause and, as such, the scope of the arbitration is limited to the subject of the Closing Date Balance Sheet. Crabtree points out that the subject matter contemplated by the arbitration provision, *i.e.*, a Closing Date Balance Sheet created by Kera Weiner, never came into existence and argues, therefore, that any dispute concerning the adjustments as determined by O'Connor & Drew need not be arbitrated.

■ We agree with Crabtree that the arbitration provision contains sufficient limiting language to warrant characterization as "narrow". *See id.*, 858 F.2d at 832 (arbitration clause deemed narrow because its effect was limited to specific circumstances); *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir.1983) (arbitration provision specifically limited to disputes regarding responsibility for repairs, renewals or replacement construed as "narrow"). Because the rules governing the application of broad arbitration clauses "that purport to refer all disputes arising out a contract to arbitration" and narrow clauses "that limit arbitration to specific types of disputes" are different, *McDonnell Douglas*, 858 F.2d at 832, when a narrow clause is in issue, the court is limited to carrying out the specific and limited intent of the parties, *S.A. Mineracao*, 745 F.2d at 193; *see McAllister Bros., Inc. v. A & S Transp. Co.*, 621 F.2d 519, 522 (2d Cir.1980) (when dealing with a narrow arbitration clause, the court must consider whether the conduct in issue is on its face within the purview of the clause).

The language of the arbitration clause at issue here is unambiguous with respect to how the Closing Date Balance Sheet which is its subject shall be prepared:

> Within 90 days after the Closing Date, the Purchaser shall cause Kera, Weiner & Co., Certified Public Accounts ... to prepare (i) a certified combined and consolidated balance sheet as of the Closing Date ... and (ii) a combined and consol-

idated balance sheet as of the Closing Date of Holdings.

Stock Purchase Agreement, Section 2.4(a). This provision makes explicitly clear that it is the balance sheet prepared by Kera Weiner that could be disputed and then sent for arbitration.

TriStar contends that the preparation of the balance sheet by O'Connor & Drew was necessitated by the inability of Kera Weiner to render an opinion. It argues that, at most, its hiring of O'Connor & Drew was a breach of contract which does not nullify the arbitration provision. *See United Packinghouse, Food & Allied Workers v. Needham Packing Co.*, 376 U.S. 247, 251, 84 S.Ct. 773, 775–76, 11 L.Ed.2d 680 (1964).[7] The real question here, which TriStar's position attempts to evade, is whether the dispute is within the scope of the arbitration agreement. We find that the arbitration clause simply does not apply to the document submitted by TriStar. " '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *Drake Bakeries, Inc. v. American Bakery & Confectionery Workers Int'l*, 370 U.S. 254, 256, 82 S.Ct. 1346, 1348, 8 L.Ed.2d 474 (1962) (quoting *United Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960)); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 241, 82 S.Ct. 1318, 1320–21, 8 L.Ed.2d 462 (1962). The language of the arbitration provision clearly designates a Closing Balance Sheet prepared by Kera Weiner as the basis for a dispute that will be submitted to arbitration. As unreasonable as this condition has turned out to be, the parties nevertheless bargained for this term.

In addition, to "determine whether a particular dispute falls within the scope of a narrow and specific arbitration clause, '[t]he tone of the clause as a whole must be considered.' " *McDonnell Douglas*, 858 F.2d at 832 (quoting *Prudential Lines*, 704

F.2d at 64). Examination of the Stock Purchase Agreement itself provides further support for our conclusion. *See McDonnell Douglas*, 858 F.2d at 832–33 (court examined the context of the arbitral clause to determine its scope). Certain clauses of the agreement name specific persons; other clauses do not. For example, the agreement states that all documents necessary to carry out the transaction must be satisfactory to TriStar's counsel, Cravath, Swaine & Moore. Stock Purchase Agreement, Section 8.1(n). *See also id.*, Section 8.1(*o*)(naming a specific law firm as tax counsel). Other clauses designate a class generally as in Section 12.3(b) of the agreement which states that "the Purchaser shall deliver to REC a letter from a financial or banking institution committing such institution to lend an amount not less than the Initial Purchase Price." *See also id.* at Section 6.4 ("[T]he Sellers shall permit the Purchaser and its counsel, lenders, accountants and other representatives access to all of the books."); Section 8.1(p) ("The funding pursuant to a financing commitment from a financial or banking institution … shall have been made available to the Purchaser"). The only reasonable conclusion to be drawn from such drafting is that at times the identity of the person referred to in the contract was significant and therefore that person was named. Other circumstances did not require the performance of a task by a specific person and then a general term was used. In light of the structure imposed on the contract, we must conclude that it was important to the parties that Kera Weiner produce the certified Closing Date Balance Sheet.

For the reasons stated above, we must conclude that the arbitration clause in the Stock Purchase Agreement has not been triggered because the document referred to was not produced and we have no reason to believe that the balance sheet produced by O'Connor & Drew is an appropriate substi-

---

**7.** This case and the others cited by TriStar for this proposition are distinguishable because those decisions interpret broad arbitration clauses in which the parties have agreed to submit all disputes to arbitration rather than narrow clauses such as the one in dispute here.

*See, e.g., Robert Lawrence Co. v. Devonshire Fabrics, Inc.*, 271 F.2d 402, 404 (2d Cir.1959) (arbitration provision stated "any complaint, controversy, or question which may arise with respect to this contract … shall be referred to arbitration.")

tute. Defendant's motion to compel arbitration and stay the proceedings is denied.

## THE MOTION TO DISMISS

Next to be considered is defendant's challenge to the sufficiency of plaintiffs' complaint. On a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), the complaint's claims are taken "at face value," *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 614, 30 L.Ed.2d 642 (1972), and dismissal is warranted only if "it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). In their lengthy complaint, plaintiffs allege seven causes of action: fraudulent inducement of contract, negligent inducement of contract, RICO, breach of contract, breach of fiduciary duty, conversion and foreclosure. The defendants assert that plaintiffs fail to state a claim in each count.

*Count 1: Fraud and Fraudulent Inducement of Contract*

■ The complaint describes four fraudulent schemes undertaken by the defendants in order to defraud the plaintiffs: 1) the destruction of the recordkeeping functions of Crabtree Automotive, rendering the preparation of the Closing Date Balance Sheet impossible; 2) the destruction of the records necessary to certify the Closing Date Balance Sheet; 3) a promise by defendants to assume obligations owed to a bank which was then abrogated, endangering plaintiffs' financial relationships with those banks; and 4) the fabrication of set-offs and adjustments to justify defendants' refusal to pay plaintiffs for the assets of Crabtree Automotive.[8] The well accepted rule is that a cause of action does not arise when alleged fraud relates to a breach of contract. *MBW Advertising Network, Inc. v. Century Business Credit Corp.*, —— A.D.2d ——, 569 N.Y.S.2d 682 (1st Dep't 1991); *Harrington v. Murray*, 169 A.D.2d 580, 564 N.Y.S.2d 738, 740 (1st Dep't 1991); *Metropolitan Transp. Au-*

*thority v. Triumph Advertising Productions, Inc.*, 116 A.D.2d 526, 497 N.Y.S.2d 673, 675 (1st Dep't 1986); *North Triphammer Development Corp. v. Ithaca Associates*, 704 F.Supp. 422, 427 (S.D.N.Y.1989). On their face, these schemes describe actions that are governed by the contract and thus do not give rise to a separate fraud claim. *See Marks v. Nassau County Association for the Help of Retarded Children, Inc.*, 135 A.D.2d 512, 521 N.Y.S.2d 742 (2d Dep't 1987). We are cognizant, though, that "a breach of contract may be so intended and planned; so purposely fitted to time, and circumstances and conditions; ... as to cease to be a mere breach of contract," *Rich v. New York Central & H.R.R.R. Co.*, 87 N.Y. 382, 393, 34 N.Y.S. 1146 (1895). Such misconduct would give rise to an action in tort. *See Albemarle Theatre, Inc. v. Bayberry Realty Corp.*, 27 A.D.2d 172, 277 N.Y.S.2d 505, 510–11 (1st Dep't 1967).

■ Read broadly, the complaint alleges that the defendants planned to purchase Crabtree Automotive and sabotage its recordkeeping in order to defraud the plaintiffs. These allegations state more than a mere breach of contract and thus would be actionable in tort. However, to sustain a tort action separate from the breach of contract claim, the tortious conduct must have breached a legal duty existing independently of the contractual relations between the parties. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980). The complaint, long as it is, fails to specify the independent duty. Thus, the fraud claim is inadequately stated.

■ With respect to the claim of fraudulent inducement of contract, Crabtree claims that the defendants represented, prior to the execution of the contract, that they would honor, in good faith, their obligations under the Stock Purchase Agreement and other collateral contracts when, in reality, they had no intention of doing so. As a rule, " 'a promise made with a preconceived and undisclosed intention of not performing it constitutes a misrepresenta-

---

**8.** We will observe that in their briefs both parties virtually ignored these allegations.

tion.' " *Deerfield Communications Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 510 N.Y.S.2d 88, 89, 502 N.E.2d 1003, 1004 (1986)(quoting *Sabo v. Delman,* 3 N.Y.2d 155, 160, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957)). However, Crabtree's allegations cannot serve as the basis for a claim of fraudulent inducement because a representation that performance will be made, even if only implied through the negotiation process, is not distinct from the contract. *Metropolitan Transp.,* 497 N.Y.S.2d at 675 (rejecting fraud claim where the allegations were for the breach of the representation of performance implicit in making the bid); *see North Triphammer,* 704 F.Supp. at 427 (allegation that explicit misrepresentations were made concerning the defendants' intentions to perform under the contract inadequate to support claim of fraudulent inducement).

▮ An exception to this rule exists if the promise made was a representation of present fact, not of future intent. *Spellman v. Columbia Manicure Mfg. Co., Inc.,* 111 A.D.2d 320, 489 N.Y.S.2d 304 (2d Dep't 1985). Therefore, to make out a case for fraud, Crabtree must assert that there were "misrepresentations which were collateral or extraneous to the agreements entered into by the parties." *North Triphammer,* 704 F.Supp. at 427 (citing *Spellman,* 489 N.Y.S.2d 304). Plaintiffs assert that promises, in addition one of performance, were made which also served as inducement for their executing the contract:

> Defendants repeatedly and falsely represented that they possessed the expertise and resources (i) to purchase and to pay for stock of Crabtree Automotive at an agreed upon price . . .; (ii) to operate the businesses of Crabtree Automotive prof-

itably; and (iii) to assume and to pay the obligations of Crabtree Automotive. In order to induce plaintiffs to sell . . . defendants Arthur K. Watson and Stuart H. Watson personally guaranteed the bulk of defendants' obligations to plaintiffs.

Complaint, ¶ 2.

The representations made above cannot be considered collateral to the contract because, as made, they simply underscore the defendant's purported intention and ability to perform the contract. Thus, these representations are simply part and parcel of the intention to perform which we earlier stated could not be separated from the breach of contract claim. *Compare Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 495 N.Y.S.2d 309, 311, 485 N.E.2d 974, 976 (1985) (informing defendants that they had a line of credit prior to their executing guarantee was a representation of present fact, not of future intent); *see North Triphammer,* 704 F.Supp. at 427. With respect to the guarantees, although they were extrinsic to the Stock Purchase Agreement, they cannot provide the foundation for a fraudulent inducement of contract claim because plaintiffs can sue on those guarantees, as well. *See Deerfield Communications,* 510 N.Y.S.2d at 89, 502 N.E.2d at 1004.[9]

This count is therefore dismissed for inadequately pleading fraud and failing to state a claim of fraudulent inducement of contract.

*Count 2: Negligent Inducement of Contract*

▮ Plaintiff bases his claim of negligent inducement of contract on the same misrepresentations discussed above in our consideration of the claim of fraudulent

---

**9.** Plaintiffs argue that *Deerfield Communications,* 510 N.Y.S.2d 88, 502 N.E.2d 1003, directly supports their position. In that case, the defendant alleged that an oral contract concerning geographic restrictions on the resale of aerosol products had been breached. He also claimed that the plaintiff had no intention of abiding by those terms when the oral contract was established, making his promise to honor the restrictions an inducement to the oral contract. The Court of Appeals held that both claims were

proper. However, the facts of *Deerfield* are distinguishable from those in the instant case. *Deerfield* actually involved two separate contracts: one concerned the sales price for the aerosol products and the other dealing with geographic restrictions on resale. The breach of contract claim involving the second contract was dismissed and therefore, the claim of fraudulent representation arising out of that contract's inducement could stand separately because there was no breach of contract action.

inducement.[10] As a rule, New York does not impose liability upon a speaker for false statements recklessly or negligently made. *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dep't 1976). There is an exception to this rule "when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller." *Id.*, 384 N.Y.S.2d at 811. Plaintiffs contend that in this case the defendants' agreement to operate the business and maintain the financial records prior to the setting of the final purchase price for the business created the special relationship upon which an action for negligent inducement of contract can be grounded. TriStar argues that although a special relationship can be created by contract, this relationship did not exist prior to the contract's execution and hence there was no duty to speak carefully at that time. While we agree that a contract arising from a negligent inducement cannot provide the special relationship that creates a duty to speak with care, we nevertheless believe that a special relationship was sufficiently alleged.

 At the time the representations regarding the financial stability and expertise of TriStar were made, the parties were in the roles of buyer and seller. It has long been recognized that the buyer/seller relationship creates a duty of care with respect to communications between the parties when the seller is acting in the course of his business, the information which is the basis of the purported misrepresentation is supplied for the guidance of the buyer, and the buyer justifiably relied upon that representation. *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 82 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); Restatement (Second) of Torts § 552(1). Here, the buyer is alleged to have made representations upon which the seller relied. We see no reason, however, to distinguish the roles as defined in *Mallis, supra,* so long as the party making the misrepresentation had a pecuniary interest in the transaction. *See id.* Indeed, given the trust that the seller was placing in the buyer with respect to protecting the seller's interests via the Stock Purchase Agreement, it seems beyond cavil that the buyer had a duty to speak with care concerning its ability to run the business.[11]

In conclusion, we find that the claim of negligent misrepresentation survives this motion to dismiss.

### Count 3: RICO

Crabtree alleges that the defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c). The RICO statute provides that

> It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

Defendants attack the plaintiff's RICO claims on the grounds that 1) that no predicate act constituting racketeering has been adequately alleged and 2) that plaintiffs have failed to properly allege a "pattern" within the meaning of RICO.

### 1. Predicate Acts

Defendants contend that plaintiffs failed to adequately allege that the defendants engaged in racketeering activity. As defined by 18 U.S.C. § 1961(1), " 'racketeering activity' means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs,

---

**10.** Defendants' contention to the contrary, no pleading with particularity is needed with respect to a claim of negligent inducement. *See Zampatori v. United Parcel Service,* 125 Misc.2d 405, 479 N.Y.S.2d 470, 472 (Sup.1984) (citing *International Prod. Co. v. Erie R.R. Co.,* 244 N.Y. 331, 155 N.E. 662, *cert. denied,* 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927).

**11.** We are not persuaded by TriStar's argument that it was not in the business of buying and selling car dealerships and therefore possessed no special expertise which nullified any duty of care with respect to its representations prior to the execution of the contract. This argument would require us to recognize the doctrine of "caveat vendor", one which we do not buy.

which is chargeable under State law and punishable for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud) ... (D) ... fraud in the sale of securities...."

Three claims grounded in fraud have been asserted against the defendants: mail fraud, wire fraud and fraud and fraudulent inducement of a contract to sell securities. As discussed earlier, the claims of fraud have been dismissed. The claims of mail and wire fraud fail because plaintiff has failed to plead fraud with particularity.

■■■■■ To show a violation of the mail and wire fraud statutes, the plaintiff must show 1) participation in a scheme to defraud and 2) knowing use of the interstate mails or interstate wires to further the scheme. *Lou v. Belzberg*, 728 F.Supp. 1010, 1025 (S.D.N.Y.1990). Here, plaintiff has not set out with particularity the allegedly numerous uses of the mails and wires on behalf of the scheme to defraud nor has he identified the defendants responsible. *Id.* "In alleging mail fraud, the plaintiffs must set forth the contents of the items mailed and specify how each of the items was false and misleading." *Official Publications, Inc. v. Kable News Co., Inc.*, 692 F.Supp. 239, 245 (S.D.N.Y.1988), *aff'd in part, rev. in part*, 884 F.2d 664 (2d Cir. 1989). Although the plaintiff argues that its claims cannot be absolutely precise with respect to the details of the predicate acts absent discovery, we find it difficult to believe that Crabtree cannot provide details of any fraudulent communications made through the mails or over the wires when the alleged fraud is based on representations made to him and his associates. We recognize that many of the facts are in the possession of the defendants; this does not mitigate plaintiff's obligation to plead sufficient details in order to provide notice to the defendants of what particular acts the complaint is based on.[12]

■■■ We will briefly touch upon defendant's contention that regardless of the deficiencies concerning the pleading of predicate acts, the plaintiff has also failed to plead a "pattern of racketeering activity". A single scheme with a definite termination date, such as purportedly existed here, can constitute a pattern of racketeering activity. *United States v. Indelicato*, 865 F.2d 1370, 1383–85 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 25, 26 (1989); *see H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). However, a plaintiff must still show a "threat of continuation of racketeering activity," *id.* at 1385, and must plead facts from which it can be inferred that the alleged acts are neither sporadic nor random, *Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989).

Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition," *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2901. The inquiry is fact-specific and relies on a number of factors: duration of racketeering acts; number of such acts; the number of participants; and the number of victims. *Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F.Supp. 926, 948 (S.D.N.Y.1989).

■■■ Here, the nature of the racketeering acts at the basis of the complaint is unclear. Hence, we cannot state definitely whether continuity exists. We will note that the scheme appears to have taken place over roughly a four month period, the number of victims is extremely limited and the overall number of participants is similarly limited. This conduct strikes us therefore as sporadic rather than continuous. *See, e.g., Landy v. Mitchell Petroleum Tech. Corp.*, 734 F.Supp. 608, 624 (S.D.N.Y.1990) (activities of defendants over a period of a few months which then ceased did not sufficiently allege continui-

---

12. Plaintiffs maintain that even if mail and wire fraud have been inadequately pleaded, predicate acts through alleged violations of New York Penal Law § 175.10 (falsifying business records) and § 190.65 (scheme to defraud in the first degree) have been properly asserted.

ty); *USA Network v. Jones Intercable, Inc.*, 729 F.Supp. 304, 317–18 (S.D.N.Y.1990) (activity spanning three and a half months involving few criminal acts and few participants in uncomplicated scheme is not continuous).

For the various reasons stated above, plaintiffs have failed to properly allege a claim based on RICO and this count must be dismissed.

### Count 4: Breach of Contract

The complaint states that "Defendant Tri–Star has completely failed to perform its obligations under the Related Agreements." Complaint, ¶ 87. The individual defendants are not specifically named as having abrogated the contracts.

■■■■ It is hornbook law that a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract. Of the defendants here, only TriStar, a corporate entity, executed the contract. Plaintiffs argue that because TriStar is a closely held corporation, the individual defendants can be reached for damages by piercing the corporate veil. In New York, to pierce the corporate veil, the following elements must be proven: 1) the absence of corporate formalities; 2) inadequate capitalization; 3) personal use of corporate funds; and 4) perpetuation of fraud through the corporate vehicle. *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50 (2d Cir. 1984); *Aries Ventures Ltd. v. AXA Finance S.A.*, 729 F.Supp. 289, 296 (S.D.N.Y.1990); *Bartle v. Finkelstein*, 19 A.D.2d 256, 260–62, 241 N.Y.S.2d 655 (4th Dep't 1963).

■■■■ Here plaintiff faces two problems. First, as the fraud allegations have already been dismissed as insufficient, no claim of perpetuating fraud through the corporate vehicle exists in the current complaint. More important, Crabtree has not alleged in any way, shape or form facts that could prove that TriStar was either an alter ego dominated by the individual defendants or formed to conduct primarily the individual defendants' personal busi-

ness. *See Bonanni v. Straight Arrow Publishers, Inc.*, 133 A.D.2d 585, 520 N.Y.S.2d 7, 9 (1st Dep't 1987) (amended complaint containing only a legal conclusion with no factual allegations supporting the alter ego claim should be dismissed); *Cusumano v. Iota Industries, Inc.*, 100 A.D.2d 892, 474 N.Y.S.2d 579, 580 (2d Dep't 1984) (same). Justice or equity is as available to the defendant as it is to the plaintiff. Without facts to suggest that the equitable remedy of ignoring the corporate form is required, *see Brunswick Corp. v. Waxman*, 599 F.2d 34, 36 (2d Cir.1979), justice demands that the breach of contract claim be dismissed against the individual defendants.

### Count 5: Breach of Fiduciary Duty

■■■■ Plaintiffs allege that defendants breached a fiduciary obligation owed to them by "disrupting the bookkeeping procedures and destroying the books and records, rendering the preparation and certification of the Closing Date Balance Sheet impossible." Complaint, ¶ 92. The foundation of the fiduciary obligation was the business relationship between the parties in which the defendants took possession of the plaintiffs' business without a final sales price being determined and continued to run it for a number of weeks. Plaintiffs charge that defendants were obligated to run the business properly in order to protect their investment. However, defendants argue that all of their obligations were described by the terms of the contract and any breach therefore can be remedied in the breach of contract action. *See* Management Agreement, Section 2.6 (TriStar agreed to "use reasonable efforts to maintain the books and records of" Crabtree Automotive "substantially as they have been in the past.").

Although defendants were obligated to use all reasonable efforts to maintain the books and records of Crabtree Automotive, this was not a simple matter of an implied undertaking to perform fairly and in good faith. *Compare Mezz v. Swim Products Co.*, 138 N.Y.S.2d 643, 646 (Sup.1955) (defendant owed no duty to plaintiff except to pay royalties on sales), *aff'd*, 1 A.D.2d 844,

149 N.Y.S.2d 278 (2d Dep't 1956). Instead, the complaint describes a fiduciary obligation on the part of the defendants which arose out of the duties they assumed under the contract. *See Davis v. Dime Savings Bank of New York, FSB,* 158 A.D.2d 50, 557 N.Y.S.2d 775, 776 (3d Dep't 1990) (allegations that bank failed to pay taxes on behalf of mortgagors pursuant to escrow arrangement stated claim for breach of fiduciary obligations); *Mandelblatt v. Devon Stores, Inc.,* 132 A.D.2d 162, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (claim that consultant employed by defendant injured corporation's business opportunity when he was under duty, as highly paid consultant, to act for corporation's benefit, stated claim for breach of fiduciary duty). "A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Restatement (Second) of Torts, § 874, comment a. The Management Agreement required the plaintiff to turn over the operation and possession of Crabtree Automotive before its final sales price was determined. The final price that plaintiff realized was to some extent dependent on how successfully the defendants ran the business. "A fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Penato v. George,* 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (2d Dep't 1976). Although defined by contract, this was nevertheless a relationship where one party trusted in and relied upon another. *Id.,* 383 N.Y.S.2d at 905. As such, plaintiffs have sufficiently stated a cause of action for its breach.

### Count 6: Conversion

Although the complaint is very unclear, it appears that at the closing, the defendants were to pay Crabtree $1 million in connection with one of the agreements. In exchange for allowing TriStar to retain this money, the defendants agreed to assume $1.7 million of obligations owed by Crabtree Automotive to various banks which presumably Crabtree would have had to satisfy upon the sale of the business. TriStar allegedly failed to satisfy these obligations and the banks then looked to the plaintiffs. Crabtree claims that by failing to satisfy the business' obligations, defendants have in effect converted the plaintiffs' $1 million which was given to the defendants in exchange for the satisfaction of that obligation.

To state a claim for conversion, a plaintiff must demonstrate that he or she had title or an immediate superior right of possession to the property allegedly converted. *Independence Discount Corp. v. Bressner,* 47 A.D.2d 756, 365 N.Y.S.2d 44, 47 (2d Dep't 1975); *Caballero v. Anselmo,* 720 F.Supp. 1088, 1098 (S.D.N.Y.1989). The facts asserted here do not demonstrate a claim based on conversion because the plaintiffs did not possess the money at the time it was converted. Although plaintiffs had a right to receive the $1 million as a consequence of the Related Agreements, this right was relinquished in order to purchase the satisfaction of the bank obligations by the defendants. At the time that the parties executed this new agreement, plaintiffs no longer possessed a superior right to the money. Instead, they owned a contractual promise. Defendants' failure to satisfy the agreement may state a cause of action based on a breach of contract, but it does not describe conversion. *See Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 452 N.Y.S.2d 599 (1st Dep't 1982) (no claim for conversion where plaintiff never had ownership, possession or control of money in dispute); *Hutton v. Klabal,* 726 F.Supp. 67, 72 (S.D.N.Y.1989) (money paid for undelivered etchings cannot be the basis of conversion action; claim for breach of contract exists instead). This count is dismissed.

### Count 7: Foreclosure

Pursuant to the Real Estate Agreement, TriStar issued a Note in favor of Robert Crabtree for $7.5 million secured by a Second Mortgage which was duly recorded. This mortgage was subordinate to a mortgage held by Chemical Bank for $7.3 million. AKW and SHW each issued a personal guaranty. Under the terms of the Note, TriStar had the right to offset its payment

obligations with sums owed to it by Crabtree. TriStar exercised this right as it claimed it was owed $9 million by the plaintiff as a result of the Closing Date Balance Sheet adjustments calculated by O'Connor & Drew and did not make the payments due.

The defendants were served with notice of default and plaintiffs now seeks to exercise their right to foreclose on the property. Defendants move to dismiss Charles Wilk from this count as he is not a signatory to the Note nor a guarantor. Plaintiffs have not opposed this motion and it is therefore granted.

## CONCLUSION

Defendants' motion to compel arbitration is denied. Defendants' motion to dismiss the complaint is granted with respect to Counts 1, 3, 4, 6 and 7. The motion is denied in all other respects. Leave to replead is granted with respect to Counts 1, 3 and 4. Plaintiffs are given 20 days to amend their pleadings.

SO ORDERED.