NORTH TRIPHAMMER DEVELOP-
MENT CORP., Plaintiff,

v.

ITHACA ASSOCIATES, Defendant and
Third–Party Plaintiff,

v.

BMU REAL ESTATE INVESTORS
CORP., Third–Party Defendant.

No. 88 Civ. 3979 (RWS).

United States District Court,
S.D. New York.

Jan. 12, 1989.

Meyer, Suozzi, English & Klein, P.C., Mineola, N.Y., for plaintiff; Brian Michael Seltzer, Kenneth L. Gartner, of counsel.

Blodnick, Pomeranz, Reiss, Schultz & Abramowitz, P.C. by Barry Golomb, New York City, for defendants; Thaler & Thaler, Ithaca, N.Y., of counsel.

## OPINION

SWEET, District Judge.

Defendant Ithaca Associates ("Ithaca") has moved pursuant to Rule 12(b)(6), Fed. R.Civ.P., to dismiss the Amended Complaint of plaintiff North Triphammer Development Corporation ("North Triphammer") on the ground that it fails to state a cause of action upon which relief can be granted. North Triphammer has also moved pursuant to Rule 12(b)(6) to dismiss Ithaca's third and fourth counterclaims, and pursuant to Rule 56, Fed.R.Civ.P. for summary judgment on its claims. Ithaca's motion was submitted and argued on August 5, 1988; North Triphammer's on November 11, 1988. Because these motions arise out of the same transactions, they will be disposed of together. For the reasons set forth below, Ithaca's motion to dismiss the complaint is denied. North Triphammer's motion to dismiss the third and fourth counterclaims is granted. Its motion for summary judgment on its claims are granted insofar as it seeks a declaration that the contract remains in effect; it is denied insofar as it seeks damages and specific performance.

### The Parties, the Pleadings, and the Facts

Ithaca is a limited partnership organized under the laws of Massachusetts. North

Triphammer is a corporation organized under the laws of New York. Ithaca is the owner in fee of a parcel of real estate in Ithaca, New York, containing a shopping center known as the "Cayuga Mall" ("the Property"). Ithaca and BMU Real Estate Investors Corporation ("BMU"), a limited partnership including Baer Mark & Upham, a New York law firm, Ekstein Rothenberg Corp. ("Ekstein Rothenberg"), a real estate finance firm, and J.D. Branmaur, Inc. of New York City, entered into a contract (the "Contract") dated May 6, 1987, pursuant to which BMU agreed to buy the Property from Ithaca for $6.8 million.

The Contract was drafted by Baer, Marks & Upham. It did not include a mortgage contingency. The contract provided that closing would take place within 120 days. One hundred thousand dollars was posted with Ithaca's attorneys as "earnest money." The Contract provides for the return of the earnest money to North Triphammer with interest thereon in case the deal did not close due to a default on the part of Ithaca.

According to Joel Rothenberg ("Rothenberg"), a principal of Ekstein Rothenberg, lending institutions were interested in providing mortgage financing for the deal. Ekstein Rothenberg worked out a tentative deal with Mellon Real Estate Investment Management Corp., a subsidiary of Mellon Bank, for a loan of $6.7 million. On or about May 4, Ekstein posted $10,000 with Mellon, and on May 5, the day before the Contract was signed, Rothenberg and a representative of Mellon went to Ithaca to inspect the Property.

Meanwhile, Rothenberg contacted two of his clients, a principal of J.D. Branmaur, Inc. of New York City, and Baer Marks & Upham. Both were included in the deal as one-third investors, with Ekstein Rothenberg making up the additional one-third. The signatory to the Contract was BMU Real Estate Investor's Corp., a corporation created for the purpose of doing the transaction.

In late May or early June, after the price for the Property was negotiated and the contract signed, the parties to the Contract met at the Harvard Club of Boston. Representatives of BMU told representatives of Ithaca that the prime rate had increased one-half of a point twice, and therefore requested a $500,000 reduction in the contract price. Ithaca, however, refused to reduce the price. Subsequently, BMU asked for a $300,000 reduction in price, stating to Arnold Bloom, General Counsel to Ithaca Associates ("Bloom"), that without the reduction, BMU could not handle the transaction. Ithaca again refused. BMU then sought a reduction by the same amount, $300,000, because of a need to repair and renovate portions of the property. This, too, was declined. According to Bloom, in this discussion, BMU's representative again indicated the difficulty that BMU was having in securing the kind of financing that he felt suitable for the acquisition of the property; Bloom reminded him both of the absence of a contingency clause in the contract and that closing was scheduled for September 3, a little more than two weeks away.

On August 6, 1987, Ithaca's attorney sent a letter to BMU's attorney including a sentence: "[b]y way of postscript, I merely want to note that time is of the essence for a closing and your cooperation would be greatly appreciated."

As of August 21, financing was apparently still not in place, for in a letter from Benjamin F. Kursman ("Kursman") to Bloom, Kursman enclosed a title commitment and report indicating that a "Loan Policy" would be issued, but both the amount of the policy and the insured lender were marked "TO BE DETERMINED."

On September 2, Ithaca's attorney received a telefax from BMU that the transaction would not close the next day because Ithaca had failed to deliver certain documents requested by the contract. The closing did not take place on September 3, 1987, 120 days after the Contract was signed, nor has it taken place since.

Ithaca alleges that BMU continued to assert after September 3, 1987 that the Contract was in full force and effect. Further, in the spring of 1988, BMU initiated a negotiation and an agreement wherein

BMU would exchange Releases with Ithaca and the Earnest Money, together with $50,000.000, would be paid to BMU. However, the agreement was never consummated.

In April, 1988, Ekstein Rothenberg obtained a firm mortgage commitment from Home Savings and Loan to provide financing for the transaction. One per cent of the loan amount was paid to that institution to secure the commitment. On April 7, 1988, BMU wrote to Ithaca declaring that it was ready to proceed to a closing on the Contract of Sale on or about May 25, 1988. However, no closing date was set.

On April 25, 1988, the Contract and purchase rights of BMU were assigned and transferred to North Triphammer, which is now the "purchaser" under the Contract of purchase and sale. North Triphammer filed a complaint against Ithaca on May 3, 1988 seeking a declaration that the Contract was in effect, damages, and specific performance. On October 17, 1988, the commitment by Home Savings and Loan was terminated.

North Triphammer commenced this action against Ithaca on May 3, 1988, alleging that Ithaca breached the written agreement with respect to the Property in six ways. First, North Triphammer alleges that Ithaca created or had created easements, grants, and/or rights of way to the property in violation of its contractual obligation to ensure that title to the property was good and marketable, and free and clear of all liens and encumbrances, except for "permitted exceptions." North Triphammer also alleges that Ithaca did not, prior to the date fixed for closing, remove the encumbrances on the title or cause North Triphammer's title company to insure North Triphammer's title without exception, as agreed, nor have they removed the encumbrances since that date. These encumbrances consist of easements of way for ingress and egress by patrons of, for example, a hotel and of Pizza Hut, as well as municipal service easements, such as those for water lines.

In addition, North Triphammer alleges that Ithaca failed to obtain and deliver to North Triphammer certain estoppels, insur-

able title (which requires payment of New York State real property transfer gains tax, a tax for which the complaint alleges Ithaca failed to obtain the assessment prior to the closing date), a waiver of a particular tenant's—Grand Union's—right of first refusal with respect to Ithaca's sale of the premise (which also caused Ithaca to be unable to deliver insurable title to the property), and a complete set of plans, specifications and plot plans, if any, for improvements on the realty. Moreover, North Triphammer alleges that Ithaca failed to obtain the prior written approval of BMU before renewing, extending, canceling, modifying or accepting the surrender of any lease affecting the property or any part of it, and entered into one or more leases of space at the premises without obtaining BMU's prior approval, in violation of the contract.

As a result of these alleged breaches of contract, North Triphammer seeks a declaration that the Contract is still in effect, damages, and Ithaca's specific performance of the contract "subject to plaintiff's contractual option to cancel and to terminate the contract as therein provided." North Triphammer also seeks costs. In addition to the complaint, North Triphammer filed a *lis pendens* on May 6, 1988, preventing Ithaca Associates' sale of property to other buyers.

In its answer, Ithaca counterclaims that BMU breached the Contract by refusing to timely close, thus entitling Ithaca on September 3, 1987 to repudiate the contract and retain BMU's $100,000 down payment as liquidated damages. Ithaca also seeks $1 million on a counterclaim grounded in fraud and $1 million on a cause of action grounded on the allegedly wrongful filing by North Triphammer of a notice of pendency.

Ithaca has also alleged that North Triphammer was unable to close because its financing was incomplete and that the September 2 letter was intended to constitute a preemptive strike. Ithaca noted that North Triphammer did not allege in the complaint that it was ready, willing and able to close. However, North Triphammer submitted an

amended complaint in which it alleges its ability to close.

### The Motion to Dismiss North Triphammer's Complaint

On a motion to dismiss a complaint or counterclaims pursuant to 12(b)(6), the factual allegations in the pleadings must be accepted as true. *Dwyer v. Regan*, 777 F.2d 825, 828–29 (2d Cir.1985). Further, the pleadings must be construed liberally, and the court must consider all allegations in the light most favorable to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In addition, a motion to dismiss should not be granted unless it appears certain that the pleader is entitled to no relief under any set of facts which could be proved in support of the claim. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Ithaca contends that North Triphammer's complaint should be dismissed on two grounds: first, because the relief sought is barred by the contract which expressly limits remedies; and second, because North Triphammer's claims are barred by laches.

### Specific Performance of the Contract

Section 14.01 of the Contract provides: (a) In the event that seller is unable to convey title in accordance with the terms of this Agreement, the sole liability of Seller shall be to cause the return to Purchaser of the Earnest Money together with all interest earned thereon and upon such payments being made this Agreement shall be deemed cancelled.

Ithaca cites several cases which hold that under New York law, clauses in contacts which limit remedies, such as liquidated damage clauses, are enforced. *See, e.g., Shepard v. Spring Hollow at Sagaponack*, 87 A.D.2d 126, 450 N.Y.S.2d 547 (2d Dept. 1982) (purchasers' exclusive remedy of return of money and reimbursement for survey and title examination costs was enforced); *Artstrong Homes, Inc. v. Vasa*, 23 Misc.2d 608, 201 N.Y.S.2d 138 (Sup.Ct. Nassau Co.1960) (plaintiff was not entitled to specific performance where contract contained an escape clause).

However, by its terms, § 14.01 of the Contract involves a seller who is unable to convey title due to a defect in title outside of the seller's control. Similarly, the cases cited by Ithaca deal with situations in which the seller was unable to convey title for reasons external to the seller. Here, to the contrary, there is no allegation that Ithaca is unable to convey title. Rather, North Triphammer alleges that Ithaca is unwilling to convey the Property. Thus, the cases cited by Ithaca are not applicable.

According to Ithaca, § 2.01 of the Contract provides a remedy precluding North Triphammer's suit. Section 2.01(B) of Contract provides in part:

If the transaction fails to close due to a default on the part of the seller, the Earnest Money and all interest earned thereon shall be delivered ... to Purchaser, and this Agreement shall thereupon be null and void. If transaction fails to close for any reason other than the default of Purchaser, ... the Earnest Money and all interest thereon [shall be delivered] to Purchaser.

This section, however, does not relieve Ithaca of its liability in the event of a willful default, particularly given the implied covenant of fair dealing and good faith in all contracts. *See, e.g., Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933); *Re Estate of Friedman*, 64 A.D.2d 70, 407 N.Y.S.2d 999 (2d Dept.1978).

### Laches

■ The May 6 Contract required closing to occur no later than 120 days thereafter, or by September 3, 1987. Because the closing date was never adjourned by the parties, September 3 also became the last day of default. The complaint in this action was not filed until May 3, 1988—fully eight months after "the last day" for performance, Ithaca argues that this constitutes laches, and cites various cases to support its claim. *See, e.g., Geithman v. Herman*, 54 A.D.2d 797, 387 N.Y.S.2d 734 (3d Dept.1976) (equitable relief was precluded where condition precedent had occurred two months earlier).

However, the Complaint cannot be dismissed on grounds of laches. "[T]he defense of laches consists of an unreasonable delay by a plaintiff to the prejudice of the defendant.... But mere delay, however long, without the necessary elements to create an equitable estoppel, does not preclude the granting of equitable relief." *Weiss v. Mayflower Doughnut Corp.*, 1 N.Y.2d 310, 318, 152 N.Y.S.2d 471, 476, 135 N.E.2d 208 (1956) (citations omitted). As explained below, time was not of the essence of the Contract between Ithaca and BMU; thus, the laches argument is insufficient to support dismissal of the complaint. Further, in its Third Counterclaim, Ithaca claims that BMU continued to assert after September 3, 1987 that the Contract was still in effect, and that BMU and North Triphammer were engaged in negotiations. Such assertion of contractual rights and the continuing negotiations precludes laches. Therefore, the motion to dismiss the Complaint is denied.

*The Motion to Dismiss the Fraud Counterclaim*

Because North Triphammer seeks dismissal of Ithaca's fraud counterclaim pursuant to Rule 12(b), the allegations in the complaint will be accepted as true for purposes of this motion. Ithaca's third counterclaim alleges:

53. Upon information and belief, BMU fraudulently misrepresented its financial condition to the defendant and fraudulently entered into the contract with defendant when BMU knew, or should have known, that it was financially unable and/or unwilling to meet its obligations under the contract.

54. Despite the fact that BMU knew, or should have known that it was in default under the contract and that said contract was null and void ... BMU continued to assert falsely after September 3, 1987, that said contract was in full force and effect.

55. Despite the fact that BMU knew, or should have known, that it was in default under the contract, BMU embarked on a course of conduct willfully and fraudulently designed to forestall and prevent defendant from alienating its property to others and to forestall defendant from commencing an action against BMU.

Ithaca further alleges that at no time did BMU intend to sign documents and close on the Contract, and that it acted falsely solely to prevent and forestall defendant from entering into contracts with others. Also, Ithaca claims that at the time BMU allegedly assigned its interest in the Contract to North Triphammer, North Triphammer knew or should have known of the fraud and misrepresentation of BMU.

To make out a case for fraud, Ithaca must assert that there were "misrepresentations which were collateral or extraneous to the agreements entered into by the parties." *Spellman v. Columbia Manicure Mfg. Co.*, 111 A.D.2d 320, 323–34, 489 N.Y.S.2d 304 (2d Dep't 1985) Thus, it is insufficient to say that "the defendants fraudulently induced [plaintiff] to enter into an agreement in that when the parties executed the agreement, the defendants had no intention of abiding by its terms." *Id.* *See also Sivel v. Readers Digest, Inc.*, 677 F.Supp. 183, 187 (S.D.N.Y.1988); *Moxie Industries, Inc. v. Hayden*, 677 F.Supp. 187, 192 (S.D.N.Y.1988). Further, "a cause of action for fraud does not arise when the only alleged fraud relates to a breach of contract." *Metropolitan Transportation Authority v. Triumph Advertising Productions, Inc.*, 116 A.D.2d 526, 497 N.Y.S.2d 673 (1st Dep't 1986). *See also Marks v. Nassau County Association for Help of Retarded Children, Inc.*, 135 A.D.2d 512, 513, 521 N.Y.S.2d 742 (2d Dep't 1987). Here, BMU's entrance into the Contract, negotiation for settlement, and assertion of its claim do not give rise to a cause of action for fraud. Contrary to Ithaca's claim that the fraud allegations in its third counterclaim go beyond breach of the Contract, no additional allegations exist beyond those dealing with the Contract.

Similarly, Ithaca's assertion that BMU negotiated a settlement of the dispute although it had no intention of signing the Releases and documents (¶ 59) is insufficient to sustain a claim for fraud. *See Goldberg v. Manhattan Ford Lincoln–*

*Mercury, Inc.,* 129 Misc.2d 123, 128–29, 492 N.Y.S.2d 318 (1985) ("[t]he court recognizes no cause of action for 'fruitless negotiation' or 'frustration.'" As for Ithaca's assertion that it was defrauded because North Triphammer "continued to assert falsely after September 3, 1987, that said contract was in full force and effect," ¶ 54, this, again, is precluded by cases which hold that no action exists for fraud based on a breach of contract. Therefore, Ithaca's third counterclaim is dismissed pursuant to 12(b)(6). However, even if Ithaca did plead a cause of action for fraud, Ithaca would lose on summary judgment, for as seen below, the Contract is still in force and therefore the fraud claims are meritless.

*Filing of a Lis Pendens*

Ithaca's fourth counterclaim requests $1 million in damages for North Triphammer's filing of a *lis pendens* against Ithaca's Property:

66. On May 6, 1988, plaintiff caused a *lis pendens* to be filed in the Tompkins County Clerk's Office against defendant's property known as the Cayuga Mall.

67. As a result ... defendant, Ithaca Associates, was unable to consummate a contract with a third party for the sale of the Cayuga mall.

68. Defendant would have entered into a contract with a third party for the sale of Cayuga Mall, but for plaintiff's intentional interference with defendant's business relations and/or prospective economic advantage.

69. As a result of the foregoing, defendant has been damaged in the sum of One Million Dollars ... with interest on the agreed price at which the property would have been sold, from May 6, 1988.

 It is a well-established in New York law that "the filing of the *lis pendens* is a proper use of a provisional remedy when filed in conjunction with an action for specific performance." *Piep v. Baron,* 133 Misc.2d 248, 506 N.Y.S.2d 838, 840 (N.Y.City Civ.Ct.1986) (citation omitted). However, if a *lis pendens* is filed to maliciously interfere with one's power to sell property, it is actionable. *Metromedia,*

*Inc. v. Mandel,* 21 A.D.2d 219, 249 N.Y.S. 2d 806, 810 (1st Dep't 1964); *Ellman v. McCarty,* 70 A.D.2d 150, 420 N.Y.S.2d 237 (2d Dep't 1979).

Although North Triphammer does not cite—and this court has not found—any authority for the proposition that the filing of a *lis pendens* claim can support a claim for intentional interference with business relations, it can support a claim for malicious interference. *Metromedia, supra; Chappelle v. Gross,* 26 A.D.2d 340, 274 N.Y.S.2d 555 (1st Dep't 1966). Here, "taking the allegations in the [counterclaim] at their face, the *lis pendens* * * * did interfere with [Ithaca's] property." *Hayman v. Janik,* 26 Misc.2d 80, 205 N.Y.S.2d 291, 294 (1960), *app. den.* 12 A.D.2d 893, 215 N.Y. S.2d 479 (4th Dep't 1961) (*quoting Schierloh v. Kelly,* 253 A.D. 373, 2 N.Y.S.2d 188, 190 (1938)).

 Nevertheless, a cause of action for the malicious filing of a *lis pendens* first requires a favorable determination for the party asserting the claim. *Metromedia,* 249 N.Y.S.2d at 810; *Ellman,* 420 N.Y.S.2d 237 ("a cause of action to recover damages for malicious institution and prosecution of an action to compel specific performance ... and the filing of a *lis pendens* in connection therewith, may not be asserted as a counterclaim in the action said to be malicious,") quoting *Bronstein v. Dayton Peninsula Corp.,* 11 A.D.2d 1036, 206 N.Y.S.2d 12 (2d Dep't 1960). Thus, the counterclaim must be dismissed at this time.

*The Motion for Summary Judgment*

Summary judgment should be granted when no material issue of fact exists, while drawing all inferences and resolving all ambiguities against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985), *cert. denied,* —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). In addition, "mere speculation or conjecture" is not enough to defeat a motion for summary judgment. *Knight v. U.S. Fire Insurance Co.,* 804

F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

With respect to Ithaca's first and second counterclaims for breach of contract and all three of North Triphammer's causes of action, a determination must be made as to whether North Triphammer or Ithaca was in breach of the Contract as of September 3, 1987. This requires a determination as to whether or not under the circumstances here time was of the essence of the contract. If time was of the essence, then BMU's failure to close on that date constituted a breach of contract. However, if time was not of the essence, then there was no need for North Triphammer to perform on that date, and the Contract was breached by Ithaca's repudiation.

*Time is Not of the Essence of the Contract*

■ As a general proposition, time is not of the essence of a contract of purchase and sale of realty in the absence of a clear provision making it so. *Spence v. Curry,* 126 A.D.2d 632, 511 N.Y.S.2d 69 (2d Dep't 1987). Even if the contract designates a specific date on which performance is to occur, time is not of the essence where the contract does not contain a specific declaration to that effect. *4200 Ave. K. Realty Corp. v. 4200 Realty Co.,* 123 A.D.2d 419, 506 N.Y.S.2d 723, (2d Dep't 1986); *Tarlo v. Robinson,* 118 A.D.2d 561, 499 N.Y.S.2d 174 (2d Dep't 1986); *Ballen v. Potter,* 251 N.Y. 224, 167 N.E. 424 (1929); *Ring 57 Corp. v. Litt,* 28 A.D.2d 548, 280 N.Y.S.2d 330 (2d Dep't 1967).

Section 5.01 of the contract between Ithaca and North Triphammer provides:

> The "Closing" of the transaction contemplated by this Agreement ... shall occur on or before a date which is no later than one hundred twenty (120) days from the date of this Agreement.

This language in the Contract does not make time of the essence. In *O'Connell v. Clear Holding Co.,* 126 A.D.2d 530, 510 N.Y.S.2d 653 (2d Dept.1987) the Court held that "[t]ime was not made of the essence by the designation that closing would take place 'on or before' a stated date." Similarly, in *Leading Building Corp. v. Seg-*

*rete,* 60 A.D.2d 907, 401 N.Y.S.2d 561 (2d Dep't), *app. dismissed,* 44 N.Y.2d 901, 407 N.Y.S.2d 697, 379 N.E.2d 223 (1978), the court held that "the parties did not evince an intention to make time of the essence by placing an 'inside date' and 'outside date' in the contract."

■ However, it is also recognized that either party can make time of the essence by giving clear and unequivocal notice that the contract must be performed within a certain reasonable time. *Levine v. Sarbello,* 112 A.D.2d 197, 491 N.Y.S.2d 419 (2d Dep't 1985), *aff'd,* 67 N.Y.2d 780, 501 N.Y.S.2d 22, 492 N.E.2d 130 (1986); *Ballen v. Potter,* 251 N.Y. 224, 167 N.E. 424 (1929); *76 North Assoc. v. Theil Management Corp.,* 132 A.D.2d 695, 518 N.Y.S.2d 174 (2d Dep't), *app. den.,* 70 N.Y.2d 612, 523 N.Y.S.2d 496, 518 N.E.2d 7 (1987). The law requires "clear, distinct and unequivocal" notice for time to be made of the essence. *Mazzaferro v. Kings Park Butcher Shop, Inc.,* 121 A.D.2d 434, 435, 503 N.Y.S.2d 134 (2d Dep't 1986). Ithaca seeks to make time the essence of the Contract by virtue of the letter of August 6, 1987 from its attorney to BMU's attorney.

■ The letter stated: "[b]y way of postscript, I merely want to note that time is of the essence for a closing and your cooperation would be greatly appreciated." Although the words "time is of the essence" were used in the letter, the language surrounding them—"by way of postscript"—and "your cooperation would be ... appreciated"—was ambiguous and vague. Stronger language in letters has failed to make time of the essence. *See, e.g., Mazzaferro,* 121 A.D.2d at 435, 503 N.Y.S.2d 134 (letter stating that "[i]n the event that title is not conveyed by the aforesaid date, be advised that the contract will be deemed null and void; and, the down payment will be returned to your clients," did not place time of the essence, for surrounding language detracted from legal effect in that it was not clear or unequivocal, as required). *But see Perillo v. De Martini,* 54 A.D.2d 691, 387 N.Y.S.2d 280 (2d Dep't 1976) (unilateral notice that if the closing did not take place on a certain

date, "said contract will be cancelled and void" made time of the essence). In this case, the reasonableness of the adjournment almost run out.

■ A contract in which time has implicitly been agreed by the parties not to be of the essence carries with it a reasonable adjournment of the closing date from that set forth in the contract. *Levine v. Sarbello, supra.* The amount of time that is "reasonable" "must be determined from the facts and circumstances of each case." *76 North Associates,* 518 N.Y.S.2d at 175 (citations omitted). "Included within a court's determination of reasonableness are the nature and object of the contract, previous conduct of the parties, the presence or absence of good faith, the experience of the parties and the possibility of prejudice or hardship to either one, as well as the specific number of days."

Further, in cases where time has been made of the essence by one party, it is always after the original not-of-the-essence closing date has passed. No case has been cited, and none has been found, where time was unilaterally made of the essence of a contract before the date set forth in the contract has passed. *See, e.g., Zev v. Merman,* 134 A.D.2d 555, 521 N.Y.S.2d 455 (2d Dep't 1987), *app. gr.,* 72 N.Y.2d 802, 530 N.Y.S.2d 554, 526 N.E.2d 45 (1988); *Mazzaferro v. King's Park Butcher Shop,* 121 A.D.2d 434, 503 N.Y.S.2d 134 (2d Dep't 1986).

*Estoppel Certificate and Waiver Requirements*

■ Article 12 of the Contract provides that Ithaca is required to deliver to the purchaser at closing estoppel certificates "with respect to the Leases to Zayre's, Fay's Drug and Grand Union and at least fifty per cent (50%) of the balance of the tenants under the Leases...." Further, delivery of these certificates is a condition precedent to the obligation of the purchaser to complete the closing. In addition, Article 16 of the Contract requires Ithaca to obtain and deliver to purchaser a waiver by Grand Union of its right of first refusal in the form annexed to the Contract.

According to North Triphammer, Ithaca Associates failed to comply with the Contract provisions concerning its obtaining estoppel certificates from specified major tenants and a percentage of other tenants. Ithaca also failed to obtain or make reasonable efforts to obtain a waiver of the right of first refusal to purchase the property contained in the lease of Grand Union, North Triphammer contends.

While it is true that on September 3, 1987, Ithaca had neither an estoppel certificate from Grand Union nor the waiver of its right of first refusal, Ithaca had given notice to Grand Union that it had 30 days to accept an offer to purchase, and an exercise of the right of first refusal had not been made by Grand Union within those 30 days. Therefore, the waiver was complete. While this procedure was not the procedure contemplated by the Contract, the difference is immaterial and does not constitute a breach.

As for the estoppel certificates, Ten tenants other than Zayre's, Fay's Drug and Grand Union are listed on schedule A. However, as of September 3, Ithaca had certificates from at most 40% of the tenants rather than the required 50%. The certificate from tenant Friendly's is dated September 9. In light of the circumstances here, this was not a material breach of the Contract.

*Easements*

■ North Triphammer contends that the existence of easements not included in the Contract's list of "permitted exceptions" constitutes a breach of the Contract. North Triphammer demands as part of its specific performance action that the easements be removed. However, the easements at issue are either ingress or egress easements permitting, for example, patrons of a motel to enter the Mall property, or municipal service easements, such as for water lines. Such easements are essentially indispensable for shopping malls.

Furthermore, these easements existed before the Contract was signed, and information concerning the easements, including the date of recording, location and scope, was expressly called to BMU's attention in

advance of entering into the Contract. They are not susceptible of being reversed or removed and do not fall within the scope of § 4.04(a) of the Contract as "encumbrances that can be removed or discharged by the payment of a sum of money," which refers to a mechanics lien or a similar encumbrance.

The contested easements are shown on the existing survey and in part on the proposed title report provided to BMU's attorney. The clause in the Contract stating that encumbrances must be removed was intended to cover encumbrances created by Ithaca subsequent to the execution of the Contract, unknown to BMU. The easements at issue thus do not constitute a material breach of Contract.

*Failure to File a Tax Form*

 Section 1447 of New York tax law provides for forms "to be completed by each transferor and transferee for each transfer." (1.(a)). On one form, "the transferor shall set forth" certain information (1.1(b)), while on the other, "the transferee shall set forth" specified information (1.(c)). Ithaca filed the transferor documents; BMU did not file the requisite transferee affidavit. Despite this, North Triphammer alleges that Ithaca breached the Contract by failing to submit a tax form necessary to transfer title.

The New York tax law does not put the duty on one party or another to supply both the transferor and the transferee forms. Instead, the procedure provides that the forms be submitted together. The duties of complying with § 1447 thus fall equally on both parties, particularly in this case, where both parties were sophisticated in real estate matters. North Triphammer contends without authority that the instructions which state that the transferee form must be attached to the transferor's questionnaire imposes a duty on the transferor.

In addition, the transaction could have closed even without the filing of the tax forms, for the closing could have been completed in escrow. The only condition of the escrow would have been the performance of a ministerial act within BMU's control—

the completion, execution and submission of a simple form. Thus, Ithaca did not breach the Contract by not filing North Triphammer's tax form by September 3, 1987.

*Certified Survey*

 Finally, North Triphammer asserts that Ithaca breached the Contract by not having on hand on September 3, 1987 a certified survey of the premises as required by the Contract. A survey was completed in or before April, 1987, and it was not difficult to make the survey current and have it certified. However, the survey had to be certified by a particular lender in order for the transaction to close, but as of August 26, 1987, BMU had not yet advised Ithaca of who the lender would be. Indeed, on August 26, a letter from Ithaca's attorney to attorney for BMU mentioned Ithaca's need to know to whom the survey would be certified. Ithaca's failure to have on hand a certified survey of the premises on September 3 was not Ithaca's fault and was not therefore a material breach.

*Closing Date*

Even after the closing date of September 3, 1987, efforts were made by the parties to bring the Contract to fruition, as evidenced by BMU's obtaining a firm mortgage commitment to provide financing for the transaction from Home Savings and Loan in April, 1988 and BMU's April 7, 1988 letter to Ithaca declaring that it was ready to proceed to a closing. These efforts were terminated by the institution of this lawsuit on May 3, 1988. Ithaca's motion to dismiss the Amended Complaint was filed on July 11, 1988 and North Triphammer's motion for summary judgment was filed on September 2, 1988. Time was never made of the essence of the Contract. Under all of these circumstances, a closing date of 45 days from the entry of this judgment is reasonable.

*Conclusion*

For the reasons set forth above, Ithaca's motion to dismiss the Complaint for failure to state a claim is denied. Because North Triphammer did not breach the Contract in

which time was not of the essence, it is entitled to dismissal of Ithaca's first and second counterclaims seeking damages for breach of Contract. It is also entitled to dismissal of Ithaca's third and fourth counterclaims for fraud and wrongful filing of a *lis pendens*. Further, North Triphammer is entitled to a declaration that the Contract remains in full force and effect. Since Ithaca did not breach the Contract, North Triphammer is not entitled to damages or specific performance.

In order to close in accordance with the Contract, North Triphammer must be prepared to pay the purchase price by the closing date. Ithaca must cure any title defects in the title within 45 days from the entry of this order. The closing date for the Contract unless further adjourned by agreement of the parties will be 45 days from the date of this opinion.

Settle order on notice.

It is so ordered.