**S.O. TEXTILES CO., INC., Plaintiff,**

**v.**

**A & E PRODUCTS GROUP, A DIVISION OF CARLISLE PLASTICS, INC., and Tyco International, Ltd., Defendants.**

**No. 97–CV–3831 (ILG).**

United States District Court,
E.D. New York.

Sept. 1, 1998.

Benjamin J. Golub, Rogovin, Golub, Bernstein & Wexler, New York City, for Plaintiff.

Mitchell J. Geller, Gilbert, Segall, and Young, New York City, for Defendants.

## MEMORANDUM & ORDER

GLASSER, District Judge.

### BACKGROUND

Plaintiff S.O. Textiles Co., Inc. ("S.O." or "S.O. Textiles") is a New York Corporation located on West 40th Street in New York City. S.O. performs work as a "jobber" in the garment and textile industry and has been engaged in this business for about 40 years. Plaintiff sells to numerous manufacturing companies various products, including textiles, hangers, buttons, zippers, seam binding, polybags, trimming, and other related items. Generally, plaintiff purchases these

items from third parties and then sells them at a markup to its own customers.

Defendant A & E Products Group ("A & E") is a Division of Carlisle Plastics, Inc. ("Carlisle"). Carlisle is a Delaware Corporation with executive offices in Phoenix, Arizona. Carlisle, in turn, is a wholly-owned subsidiary of Tyco International (US) Inc. ("Tyco").

A & E is engaged in the business of manufacturing garment hangers. One of the manufacturers from whom plaintiff S.O. purchased hangers was A & E. The hangers purchased from A & E were, for the most part, hangers whose specifications are approved for use by "huge nationwide retail clothing chain stores such as, for example, K–Mart, Wal–Mart, Mervyns and others." These so called "approved hangers" are accepted by these retail stores for their sales programs. If garments are delivered to the stores without approved hangers, the stores would not accept the garments. Therefore, plaintiff's customers that were garment manufacturers were required to use only approved hangers in order to sell garments to these stores. ¶ 16.

In late December of 1996 or early January of 1997, A & E's then President and CEO, Clifford A. Dupree ("Dupree") along with others from A & E met with plaintiff and suggested to plaintiff that it purchase virtually all of its approved hangers from A & E. As incentive to do so, A & E offered plaintiff a seven percent rebate on all gross dollars invoiced by A & E to plaintiff in excess of $225,000 per month.

Plaintiff S.O. claims that Dupree made the following representations to plaintiff:

1. Defendant A & E was "delighted" that plaintiff was "aggressively growing [its] garment hanger business."

2. A & E wants "to help [S.O.] be as successful as [it] can."

3. A & E "enjoyed [its] relationship with Julie [Bernstein] [a principal of Plaintiff]."

4. "[I]f we [A & E and S.O.] can sell more hangers and have some fun together doing it we all win."

5. A & E would "always continue to be price competitive."

6. A & E "would provide a seven percent rebate on all dollars invoiced in excess of $225,000 in any month."

Compl. ¶¶ 22–23. Dupree further represented that their understanding and agreement would continue for the "long term" and it would not be less than one year before the parties would begin to discuss any modifications to the contract.

The parties' understanding and agreement was memorialized, in part, in a written letter agreement dated January 10, 1997, a copy of which was annexed to the plaintiff's complaint. This letter states in full:

I'm delighted you are aggressively growing your garment hanger business. Among distributors, you are our largest customer and so, of course, we want to help you be as successful as you can. In addition, I've personally enjoyed my relationship with Julian and I know it can be fun to work with him. So, if we can sell more hangers and have some fun together doing it, we all win.

Our relationship is based on the following:

- Product Line: A & E offers one of the broadest product lines available.

- Service: From our North Bergen, New Jersey facility, we have the ability to make same day or next day deliveries.

- Price:

 ✓ We have always and will continue to be price competitive (price list attached) *

 ✓ We will provide a 7% rebate (payable on the 20th of the month following) on all dollars invoiced in excess of $225,000 in any month.

*In those instances when market prices are demonstrated to be below A & E prices, we will rebate the difference based on monthly review of shipments and prices.

We also would like to hold a meeting, in New York, to discuss concepts like team selling, drop shipments, and any other ideas which may be mutually helpful.

Compl. (unnumbered attachment to complaint). The letter is signed by Clifford A.

Dupree, President and CEO of Carlisle Plastics, Inc.

In early February of 1997, A & E's new President, Steven McDonough, reconfirmed A & E's prior agreement. However, in a letter dated February 5, 1997, McDonough wrote: "we will continue to provide a 7% rebate on all dollars invoiced in excess of $225,000 in any month provided the W.A.F. Group, Inc. does not solicit our customers without prior approval. The discount will discontinue if we feel our customers are being solicited by the W.A.F. Group, Inc." This letter is also attached to plaintiff's complaint.

Plaintiff relied on the above representations and as a result began purchasing fewer and fewer hangers from its other hanger supplier, Different Dimensions. In addition, plaintiff abandoned its plan to manufacture approved hangers itself.

In early May of 1997, defendant A & E purchased Different Dimensions. After this purchase, plaintiff claims that A & E "controlled or monopolized virtually all, or substantially all, of the sale and supply of Approved Hangers which the Plaintiff was purchasing to resell to Plaintiff's Customers, who were selling garments to the Program Stores." Compl. ¶ 31. Then, [a]lmost immediately after the purchase of Different Dimensions, Defendant A & E unlawfully and illegally breached and reneged on its contractual agreement and representations to Plaintiff.... Defendant A & E went 'back on its word' with respect to those agreements and representations contained in Exhibits 'A' and 'B' and went 'back on its word' with respect to their oral representations made to the Plaintiff at Defendant A & E's meeting with the Plaintiff. Defendant A & E was no longer willing to abide by its letter agreements and oral understandings which Plaintiff believed were reached in good faith between the Plaintiff and Defendant A & E. Compl. ¶ 32.

A & E demanded that plaintiff enter into a written distribution agreement, which contained "much harsher and more onerous terms than the existing oral and letter agreement," including a smaller rebate. Compl. ¶ 33. The agreement also required that plaintiff would agree not to compete with A & E. In order to get plaintiff to agree to the terms of the distribution agreement, A & E told plaintiff that A & E would no longer sell any hangers, including approved hangers, to S.O. Plaintiff, however, refused to sign the new agreement, noting that it would abide by the original understanding between the parties. As a result, A & E refused to sell any hangers to S.O. and would not ship the hangers that plaintiff had ordered prior to the parties disagreement. Compl. ¶¶ 35, 36.

A & E then proceeded to inform customers of S.O. that S.O. could no longer buy hangers from A & E and thus could not provide approved hangers to its customers. Compl. ¶ 38. A & E noted that those needing approved hangers would either have to purchase them from A & E directly or buy approved hangers only through jobbers who had signed distribution agreements with A & E. Compl. ¶ 39. S.O. further alleges that A & E has forbidden and continues to forbid any of its customers from reselling any hangers to plaintiff, stating that A & E will no longer sell to any customer who does so. *Id.*

As a result of these actions, plaintiff "lost substantial amounts of sales of hangers, and/or profits on the sale of hangers, including but not limited to Approved Hangers with respect to Plaintiff's customers and/or new customers, who sold garments to the Program Stores." Compl. ¶ 46. Plaintiff then instituted the present lawsuit.

Plaintiff's complaint alleges breach of the contract against A & E; fraud and misrepresentation against A & E and Tyco; tortious interference with plaintiff's business against A & E; payment of rebates already earned against A & E; payment of future rebates against A & E; reimbursement to plaintiff for costs to create its own hanger manufacturing capacity against A & E and Tyco; accounting against A & E and Tyco; conspiracy to monopolize and restraint of trade in violation of Sherman Act §§ 1, 2; unlawful merger or acquisition in violation of the Clayton Act § 7; attempted monopolization and monopolization in violation of the Sherman Act § 2; conspiracy in restraint of trade in violation of the New York General Business Law § 340.

In response, defendants in their answer filed counter claims against plaintiff for payment for goods sold and delivered and payment for an account stated.

Defendants now move, under Rule 12(c) of the Federal Rules of Civil procedure, to dismiss all of the claims brought against them except for payment of reimbursements already earned. Defendants also move, under Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on both of their counter claims. Each of defendants' arguments will be discussed in turn.

## DISCUSSION

### I. *Judgment on the Pleadings Standard*

A motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) is analyzed under the same standard as a motion Rule 12(b)(6). *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.1994) (citing *Ad–Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987)). Under such an analysis, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [plaintiff's] claim that would entitle [it] to relief." *Id.*

### II. *Breach of Contract*

Defendants argue that plaintiff's breach of contract claim should be dismissed for failure to state a claim. To state a claim for breach of contract under New York law, a plaintiff must allege: (1) a contract; (2) performance of the contract by one party; (3) breach of the contract by the other; and (4) damages. Defendants argue that plaintiff has failed both to allege performance of its obligations under the contract and failed to allege the terms of the contract that were breached by A & E.

### A. *Failure to Allege Performance*

It is not necessary for a complaint to specifically state each element of a breach of contract claim. Rule 8 of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim." However, "when pleading a claim for the breach of an express contract, as in the instant case, the complaint must contain some allegation that the plaintiff's actually performed their obligations under the contract." *R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.*, 811 F.Supp. 986 (S.D.N.Y.1993) (citing 2A Moore et al., Moore's Federal Practice ¶ 8.17[7] (2d ed.1992)).

After examining plaintiff's complaint, this court agrees that plaintiff has failed to allege that it actually performed its obligations under any contract it may have had with A & E. For example, nowhere in plaintiff's complaint does it explicitly state that it ever received, accepted, and paid for any hangers purchases from A & E, although this allegation is implicit in ¶ 53 of its complaint, which claims that defendant A & E never paid plaintiff any of the rebates to which it was entitled for gross sales made prior to the time A & E refused to sell any more hangers to plaintiff. Indeed, plaintiff itself states that the allegation that it "performed all of its obligations pursuant to the letter agreements . . . was not, concededly, specifically made." Pl. Mem. of Law I 14.[1]

Despite this infirmity, given this court's duty to construe the pleadings "to do substantial justice," Fed.R.Civ.P. 8(f), an outright dismissal of plaintiff's breach of contract claims is not warranted. Rather, this court will allow plaintiff thirty days from the date of this order to amend their complaint to add an allegation that it has performed all of its obligations under any contract they may have with A & E that would entitle S.O. to the relief it seeks. Therefore, conditioned

---

1. Plaintiff has submitted two memos of law. The first is entitled "Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss and for Judgment on the Pleadings" and is referred to throughout this memo as "Pl. Mem. of Law I." Plaintiff's second memo is entitled "Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss and for Judgment on the Pleadings Regarding Plaintiff's Antitrust Claims" and is referred to throughout this memo as "Pl. Mem. of Law II."

upon plaintiff's filing of an amended complaint, we deny defendants' motion to dismiss on these grounds. *See Reuben H. Donnelley Corp. v. Mark I Marketing Corp.*, 893 F.Supp. 285 (S.D.N.Y.1995).

■ Defendants also argue that plaintiff has failed to allege which terms of the parties' agreement defendant breached. However, "[i]t is now axiomatic that a complaint need only provide 'a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154, 1160 (S.D.N.Y.1988). It is clear from the face of the complaint that plaintiff is alleging that defendants failed to provide rebates to defendant as required by the letter agreement attached to its complaint and that A & E, after a particular date, refused to sell plaintiff any hangers whatsoever. *See* Compl. ¶¶ 36, 53. These claims are sufficient to put defendants on notice of the claims against them. *See id.*

### B. Failure to allege a contract for future purchases of hangers

■ Nevertheless, although plaintiff's allegations do adequately allege a contract for rebates of hangers already purchased by plaintiff, plaintiff has not sufficiently alleged a contract with respect to the sale of future hangers.

Plaintiff's breach of contract claim is based on the letter dated January 10, 1997, which is quoted in full above, as is the letter dated February 7, 1997. These letters, however, constitute nothing more than an offer by defendants to provide plaintiff with a 7% rebate if plaintiff purchases more than $225,-000 worth of hangers from it in any one month. Such an offer, standing alone, is not a contract.[2] Rather a contract is formed only when plaintiff accepts the offer—i.e., when plaintiff actually does purchase more than $225,000 worth of hangers in any one month. Such an offer is revocable at any

time before it is accepted. *See* Calamari & Perillo, Law of Contracts, p. 62 ("If A offers B a stated quantity of certain goods as B may order from time to time during the next year at a fixed price, A has made an offer looking to a series of bilateral contracts. Each time B places an order he impliedly promises to pay. If several orders are placed, a series of bilateral contract arises. As to the future, however, the offer remains revocable.")

■ Plaintiff, nevertheless, alleges that defendants promised orally to sell it hangers and to provide rebates for at least a one-year period. However, an offer can only be made irrevocable—that is, become a "firm offer"— for a length of time if its promise not to revoke is supported by consideration or if the term of duration is in writing. *See* Farnsworth, Contracts, § 3.23; N.Y.Jur. § 30. Furthermore, a firm offer beyond a period of three months is invalid without consideration, even where it is in writing. *See id.* Here it is undisputed that there is no written provision stating that the defendants' offer will be held open for any length of time. Furthermore, even if it were true that A & E orally promised that it would sell plaintiff hangers and provide rebates for at least one year, this promise was not supported by consideration. Thus, A & E would still be free to revoke their offer whenever they chose to do so.

Therefore, this court finds that plaintiff has stated a cause of action for breach of contract for any month in which plaintiff purchased more than $225,000 worth of hangers from defendant and for which it was not paid a rebate. However, since this offer was revocable by defendants at any time prior to plaintiff's purchase of hangers in any given month, no breach of contract claim can be made out for any request to purchase hangers that was made after defendants offer was revoked.

### III. Tortious Interference

■ It is unclear from plaintiff's pleading whether its tortious interference claims re-

---

**2.** Indeed, plaintiff at oral argument admitted that it was not obligated to perform under the alleged contract between itself and defendants:

THE COURT: It's not the question. The question I asked, what did this so-called agreement, what did it obligate S.O. to do? Was S.O. Textiles obligated to do anything at all? Were they obligated to buy one hanger from A & E? MR. GOLUB: No, they weren't.

late to interference with existing contractual relations or interference with prospective business relations, although plaintiff's memo of law suggests that it intended to plead both causes of action.

 To state a claim for tortious interference with contractual relations under New York law, "a plaintiff must allege (1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 77 (S.D.N.Y. 1995). Plaintiff has not alleged the existence of a valid contract between itself and a third party for a specific term. The existence of such a contract will not be inferred from allegations in plaintiff's complaint, which states that because A & E would no longer sell it hangers, plaintiff could not supply its customers with hangers. This fact alone does not suggest that plaintiff has any contracts With any third party to supply it hangers for a specific term.

Furthermore, even if this court were to assume the existence of a contract between plaintiff and a third party, there has been no allegation that any such contract has been breached. Plaintiff thus fails to allege another necessary element of a claim for tortious interference. *See Robins v. Max Mara, U.S.A., Inc.,* 923 F.Supp. 460, 468 (S.D.N.Y. 1996) ("In order for the plaintiff to have a cause of action for tortious interference of contract, it is axiomatic that there must be a breach of that contract by the other party.") (internal quotation marks and citations omitted). Indeed, "[p]laintiff does not even assert a conclusory factual allegation that contracts have been breached as a result of defendants' actions." As one court has stated:

> While the complaint alleges that "customers and potential customers" have "refused" to buy plaintiff's goods, that one customer "reduced its annual order," and that another "suddenly stopped buying" from plaintiff, there is no allegation that any customer or potential customer was obligated by contract to behave otherwise, let alone that its failure so to behave constituted a breach of such contract.

*Fun-Damental Too, Ltd. v. Gemmy Industries Corp.,* 1996 WL 724734 *4 (Dec. 17, 1996) (quoting *L.G.B., Inc. v. Gitano Group, Inc.,* 769 F.Supp. 1243, 1254 (S.D.N.Y.1991)).

IV. *Tortious Interference with Prospective Business Relations*

 To state a claim for tortious interference with prospective business relations, plaintiff must allege that "defendants interfered with business or economic relations between the plaintiff and a third party, either (1) With the sole purpose of harming the plaintiff; or (2) by dishonest, unfair or improper means." *Campo v. 1st Nationwide Bank,* 857 F.Supp. 264, 273 (E.D.N.Y.1994). " 'If the defendant's interference is intended, at least in part, to advance its own competing interest, the claim will fail unless the means employed include criminal or fraudulent conduct.' " *Id.* (quoting *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 269 (2d Cir.1987)).

S.O.'s complaint does not allege facts that show that defendants acted solely to harm plaintiff and not to advance their own interests. Furthermore, plaintiff has not alleged facts demonstrating criminal or fraudulent actions taken by defendants in furtherance of their alleged interference. Even if A & E did indeed approach plaintiff's customers and inform them that A & E would no longer be selling plaintiff approved hangers, such actions are neither criminal nor fraudulent.

V. *Fraud*

 Defendants argue that plaintiff's fraud claim must be dismissed because it states nothing more than the alleged breach of contract. Defendants are correct.

 Under New York law, "a party cannot maintain a fraud claim if the alleged fraud is merely the breach of contract." *D.S. America (East) v. Chromagrafx Imaging Systems,* 873 F.Supp. 786, 795 (E.D.N.Y. 1995) (citations omitted). Where the alleged fraudulent allegations "do not concern representations which are collateral or extraneous to the terms of the parties' agreement, a cause of action sounding in fraud does not lie." *Id.* 873 F.Supp. at 796 (citations omit-

ted). *See also McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58 (2d Dep't 1991). "Thus, '[a] cause of action for fraud in inducing a contract cannot be based solely upon a failure to perform contractual promises of future acts. An alleged failure to perform such acts is a breach of contract which must be enforced by an action on the contract.... On the other hand, a misrepresentation of present fact, not of future intent, collateral or extraneous to the contract, but which is an inducement to the contract, can give rise to a separate claim of fraudulent inducement.'" *Id.* (citation omitted).

Here, despite plaintiff's contentions to the contrary, it is clear that its fraud claim relates solely to the terms of the contract. Plaintiff states that it entered the contract with defendant and purchased fewer and fewer hangers from Different Dimensions because of A & E's promise that it would provide plaintiff with a 7% rebate on its purchases. Plaintiff contends that defendant never intended to fulfill this promise, but rather meant to induce plaintiff into the contract solely so it could purchase Different Dimensions, thereby gaining a monopoly on the approved hanger business.

The fraudulent representations alleged by plaintiff are not extraneous to the terms of the contract between plaintiff and defendants. Rather, "[t]he inducements of which plaintiff complains were inextricably considered by him to be essential terms of the agreement." *Sivel v. Readers Digest, Inc.*, 677 F.Supp. 183, 187 (S.D.N.Y.1988). "Although a promise made with a preconceived and undisclosed intention of not performing it can give rise to a fraudulent inducement claim ... the promise must be collateral or extraneous to the terms of the agreement, not merely a promise to perform under the express terms of the contract even if made with no intention to abide by the stated intention." *Id. See also North Triphammer Development v. Ithaca Assoc.*, 704 F.Supp. 422, 427 (S.D.N.Y.1989) ("[I]t is insufficient to say that 'the defendant fraudulently induced [plaintiff] to enter into an agreement in that when the parties executed the agreement, the defendants had no intention of

abiding by its terms.'") (quoting *Spellman v. Columbia Manicure Mfg. Co.*, 111 A.D.2d 320, 323, 324, 489 N.Y.S.2d 304 (2d Dep't 1985)). Therefore, plaintiff's fraud claims must be dismissed.

VI. *Reimbursement for Cost of Manufacturing Facility*

In its sixth cause of action, plaintiff claims that defendants should be required to reimburse plaintiff for the costs of building a hanger manufacturing facility. In plaintiff's memo of law, it states that "[t]he sixth cause of action alleges an element of damage incurred by the Plaintiff as a result of the Defendants' breach of contract and fraudulent conduct." Pl.Mem. of Law I 51. However, plaintiff cites no legal authority for its assertion that it is entitled to such relief and this court knows of none. Indeed, the relevant legal authority instructs that such damages should not be awarded. *See Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng.Rep. 145, 151 (1854) ("Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it."). Thus, this claim must also be dismissed.

VII. *Accounting*

Plaintiff's seventh cause of action for an accounting must be dismissed for failure to state a claim upon which relief can be granted. Plaintiff itself admits that "the right to an accounting is premised upon the existence of a confidential or fiduciary relationship." Pl.Mem. of Law I 54 (citations omitted). *See also Rodgers v. Roulette Records, Inc.*, 677 F.Supp. 731, 738–39 (S.D.N.Y. 1988).

There is no fiduciary relationship between plaintiff and defendant. Plaintiff's argument that "[b]ecause of the special relationship created, here the sharing of customers, the

providing of confidential information by Plaintiff to Defendants about Plaintiff's customers, and the 'common-ground' of both Plaintiff and Defendants, the Defendants owe Plaintiff an accounting" is legally insufficient. "Where the relationship is purely commercial—as it is between [plaintiff] and [defendants]—no fiduciary relationship exists." *Welch Foods, Inc. v. Moran,* 1996 WL 107130 (W.D.N.Y.1996) (*citing Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.,* 33 A.D.2d 766, 306 N.Y.S.2d 599, 600 (1st Dept.1969)).

## VIII. *Antitrust Claims*

### A. *Section One of the Sherman Act*

■■ Plaintiff asserts that defendants have violated sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act. Section 1 of the Sherman Act provides in relevant part that subject to certain limitations "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is declared to be illegal." 15 U.S.C. § 1. To establish a claim of restraint of trade under § 1, a plaintiff must prove (1) that two or more defendants entered into a contract, combination or conspiracy, and (2) that the conspiracy was in restraint of trade in interstate commerce. *See Belfiore v. New York Times Co.,* 826 F.2d 177 (2d Cir.1987).

■ In its complaint, plaintiff alleges a conspiracy in restraint of trade between defendants Tyco and A & E. However, "an agreement between a parent corporation and its wholly-owned subsidiary or its agents is not a concerted action for purposes of the Act." *Capital Imaging Assoc., P.C. v. Mohawk Valley Medical Assoc.,* 996 F.2d 537 (2d Cir.1993) (citing *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). Plaintiff in its complaint states that A & E is a subsidiary of Tyco. *See* Compl. ¶ 14. Thus, plaintiff cannot establish a violation of Section One of the Sherman Act and this cause of action is dismissed.

### B. *Section 2 of the Sherman Act and Section 7 of the Clayton Act*

■ Section 2 of the Sherman Act provides in relevant part that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2. Section 7 of the Clayton Act states in relevant part that "[n]o person .. shall acquire ... the assets of another person ... where ... the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

■ "A private plaintiff seeking damages under the antitrust laws must establish standing to sue." *Florida Seed Co., Inc. v. Monsanto Co.,* 105 F.3d 1372, 1374 (11th Cir.1997). To establish standing, a plaintiff must allege an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Sage Realty Corp. v. ISS Cleaning Services Group,* 936 F.Supp. 130 (S.D.N.Y.1996) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). *See also Re–Alco Indus., Inc. v. National Ctr. for Health Educ., Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993) (an antitrust complaint must adequately define the relevant product market, allege antitrust injury, and allege conduct in violation of the antitrust laws).[3] "[N]ot all competitive conduct that injures another allows resort to law regulating trade." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assoc., Inc.,* 996 F.2d 537, 539 (2d Cir.1993). A plaintiff bringing an antitrust claim is thereby obligated to demonstrate "that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Id.*

---

**3.** The requirement of "antitrust injury" applied to claims based on violations of Sections 1 and 2 of the Sherman Act, *see Fischer v. NWA, Inc.,* 883 F.2d 594, 599 (8th Cir.1989), and to alleged violations of Section 7 of the Clayton Act, *see Brunswick,* 429 U.S. at 489, 97 S.Ct. 690; *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

996 F.2d at 543. This requirement stems from the principle that the antitrust laws protect competition, not competitors. *See Volmar Distributors, Inc. v. New York Post Co., Inc.,* 825 F.Supp. 1153, 1159 (S.D.N.Y. 1993) (citing *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Thus, to survive a motion to dismiss, plaintiff must plead specific facts demonstrating that the defendants' conduct "injured the competitive structure of the market." *Naso v. Park,* 850 F.Supp. 264, 271 (S.D.N.Y.1994).

In support of its contention that it has sufficiently pleaded an antitrust injury, plaintiff cites to paragraphs 33, 34, 36, 68, 99(d) of its complaint, arguing that is has alleged higher prices and injury to competition. Those paragraphs read as follows:

33. After Defendant A & E purchased Different Dimensions and "cut-off" the only second source of supply of Approved Hangers for the Program Stores, and after Defendant A & E was monopolizing Approved Hanger sales and supply, and with Plaintiff then unable to manufacture these Approved Hangers themselves, Defendant A & E demanded that the Plaintiff enter into a written distribution agreement. This distribution agreement contained much harsher and more onerous terms than the existing oral and letter agreements, which terms included a substantially smaller rebate to the Plaintiff than had previously been agreed upon and which distribution agreement required, among other things, that Plaintiff agree that it would not compete with Defendant A & E.

34. Defendant A & E threatened the Plaintiff that if the Plaintiff did not sign the distribution agreement Defendant A & E would no longer sell any hangers whatsoever to the Plaintiff including, but not limited to, Approved Hangers.

36. As a result of Plaintiff's position as set forth above, Defendant A & E notified Plaintiff that Defendant A & E would no longer sell any hangers whatsoever to the Plaintiff and would not even ship the hangers which Plaintiff ordered prior to the time that Defendant A & E unlawfully and illegally canceled its agreement with the Plaintiff.

68. As set forth more fully above, upon acquiring monopoly power in and control of the market for Approved Hangers, Defendants refused to honor the contract between Plaintiff and Defendant A & E for the sale of Approved Hangers, and refused to sell Approved Hangers to Plaintiff, except at terms far less favorable than those provided for in the aforesaid contract.

99(d). As a result of the lessening of competition in the relevant market, prices for Approved Hangers have, upon information and belief increased.

Plaintiff has clearly alleged injury to its own business; however, it does not assert any facts whatsoever from which an injury to competition in the market as a whole can be inferred. For example, plaintiff has not asserted that the cost to consumers of approved hangers has increased because of A & E's purchase of DDI. There is simply "no well-pleaded allegation that [defendants'] conduct injured the competitive structure of the market," *Naso,* 850 F.Supp. at 271 (citing *Volmar Distributors, Inc. v. New York Post Co., Inc.,* 825 F.Supp. 1153, 1160 (S.D.N.Y. 1993)). And plaintiffs conclusory statement in paragraph 99 will not suffice to allege an antitrust injury. *See Speed Auto Sales, Inc. v. American Motors Corp.,* 477 F.Supp. 1193, 1196–97 (E.D.N.Y.1979) (In antitrust cases, "bare bones statements ... of injury under the antitrust laws without any supporting facts permits dismissal."). Therefore, plaintiff's federal antitrust claims are dismissed. *See, e.g., Re–Alco v. National Center for Health Educ.,* 812 F.Supp. 387, 392 (S.D.N.Y. 1993) ("The intent to harm a particular competitor is not actionable, even if a distributor competitor is put out of business.").

### C. *The Donnelly Act*

 Plaintiff's complaint also alleges a claim under the Donnelly Act, N.Y.Gen. Bus.L. § 340. The Donnelly Act declares illegal every contract, agreement, arrangement or combination whereby a monopoly is established or maintained, or whereby competition or the free exercise of any activity in

the conduct of any business, trade or commerce is restrained.

The New York Court of Appeals has held that the Donnelly Act "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *Anheuser–Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 520 N.E.2d 535 (1988) (citations omitted). *See also Volmar Distribs., Inc. v. New York Post Co., Inc.*, 825 F.Supp. 1153, 1167 N.24 (S.D.N.Y.1993); *Clorox Co. v. Winthrop*, 836 F.Supp. 983, 988 n. 3 (E.D.N.Y.1993). Here, plaintiff has not pointed to any considerations of New York State policy, differences in statutory language, nor legislative history that would warrant interpreting the Donnelly Act more broadly than the federal antitrust laws in this case. In light of the court's dismissal of plaintiff's federal antitrust claims, the Donnelly Act claims should also be dismissed.

IX. *Defendants' Motion for Summary Judgment*

■ Defendants have filed counterclaims against plaintiff,[4] seeking to recover $1,430,-191.34 for goods that A & E or Different Dimensions, Inc. sold and delivered to S.O. from December 1996 through May 1997. A & E argues that since S.O. did not reject the goods nor advise A & E or Different Dimensions of any nonconformity, S.O. is required to pay for them. Furthermore, A & E and Different Dimensions sent S.O. Textiles invoices, to which S.O. Textiles did not object and in fact retained. This created an account stated in favor of A & E and DDI.

S.O. does not dispute that the hangers were delivered, nor does it dispute that the invoices sent by the Defendants were, for the most part, accurate. Rather, S.O. contends that summary judgment is not appropriate because summary judgment cannot be granted on a seller's counterclaim for goods sold and delivered when unresolved factual issues

exist in a buyer's action for damages resulting from a breach of the underlying contract of sale.

Here, however, there are no unresolved factual issues regarding the purchase and sale of the hangers other than whether S.O. is entitled to rebates. Therefore, this court grants summary judgment to defendants for payment of goods that A & E or Different Dimensions, Inc. sold and delivered to S.O. from December 1996 through May 1997. Plaintiff is entitled to an offset of 7% of the purchase prices of the goods for any month in which it purchased $225,000 or more of hangers. This part of the case is therefore referred to Magistrate Judge Steven M. Gold for a determination of defendants' damages and a determination of any offsets to which plaintiff is entitled.

### CONCLUSION

For the reasons set forth above, plaintiff's claims for tortious interference, fraud, reimbursement for the cost of building a manufacturing facility, and an accounting are dismissed. Plaintiff's antitrust claims are also dismissed. Plaintiff's claims for breach of contract are dismissed as far as they concern any claims for damages after defendants withdrew their offer to sell plaintiff hangers. In regards to plaintiff's claims for breach of contract for hangers already purchased by plaintiff but for which no rebates were provided by defendants, this court grants plaintiff thirty days from the date of this order to amend its complaint to add an allegation, if it can truthfully do so, that it has performed all of its obligations under its contracts with defendants.

Furthermore, defendants motion for summary judgment on its counterclaims is granted, with an offset permitted to plaintiff for unpaid rebates.

SO ORDERED.

---

4. Prior to October 1, 1997, S.O. Textiles merged into W.A.F. Group. Pursuant to an agreement, W.A.F. assumed the rights, liabilities, and obligations of S.O. Textiles. A stipulation and order were signed on January 8, 1998 stating the W.A.F. "agrees to be liable for any judgment in this action to the same extend as S.O. Textiles."